UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

DANIEL PATRICK LARKIN,                        :

        Plaintiff,                        :

        vs.                        :        No. 3:12cv0035(WIG)

MICHAEL J. ASTRUE,                        :
Commissioner of Social Security,
                                  :

        Defendant.
-------------------------------------------------------------X

<u>RECOMMENDED RULING ON PENDING MOTIONS</u>

Pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), Plaintiff has filed this appeal of the adverse

decision of the Commissioner of Social Security[1] denying his application for Supplemental

Security Income ("SSI") benefits under Title XVI of the Social Security Act.[2]  The procedural

background of this case is undisputed.  After an administrative hearing, ALJ Ronald Thomas

issued a decision on May 2, 2011, finding that Plaintiff had not been under a disability since May

26, 2009, the date his application for SSI was filed (R. 31).  Plaintiff has now moved for an order

reversing the decision of the Commissioner, or, in the alternative, for a remand for a rehearing

[Doc. # 16], to which the Commissioner has responded with a motion to affirm [Doc. # 19].  For

---

[1]  The Decision of the Administrative Law Judge ("ALJ") (R. 24-32) became the final decision of the Commissioner, subject to review by this Court, when the Appeals Council denied Plaintiff's request for review.  20 C.F.R § 416.1481.

[2]  Plaintiff had also filed an application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (R. 165).  His date last insured for purposes of establishing his entitlement to DIB was December 31, 2005 (R. 196).  At the hearing before the ALJ, Plaintiff's counsel amended his date of onset of disability from January 1, 2006, to May 26, 2009 (R. 54), which is beyond his date last insured, thus disqualifying Plaintiff from receiving DIB.  *See Arnone v. Bowen*, 882 F.2d 34, 37 (2d Cir. 1989).

1

the reasons set forth below, the Court recommends that the decision of the Commissioner be reversed, and this matter remanded for further proceedings.

Standard of Review

The standard of review of a Social Security disability determination under 42 U.S.C. § 405(g) is well-settled.  It involves two levels of inquiry.  First, the Court must decide whether the Commissioner applied the correct legal principles in making his determination.  Second, the Court must decide whether the Commissioner's determination is supported by substantial evidence.  *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998);  *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008).  Substantial evidence means "more than a mere scintilla."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citation and quotation marks omitted).  It need not compel the Commissioner's decision; rather it is only that evidence that "a reasonable mind might accept as adequate to support [the] conclusion" being challenged.  *Id.; see also Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002).  It is not this Court's function to determine *de novo* whether the claimant was disabled nor to substitute its opinion for that of the Commissioner.  Rather the Court must determine whether the Commissioner's decision is supported by substantial evidence in the record as a whole or whether it is based on an erroneous legal standard.  *See Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998).

Background

Plaintiff, who is English-speaking and has a high school education, was born in 1968, thus making him 42 years of age at the time of the ALJ's decision (R. 40-41, 188).  At the hearing, he testified that he was living with his mother (R. 40).  He was divorced and the father of one child, who lived with her mother (R. 40).  Plaintiff's past relevant work included counter-

2

top fabricating and installation (R. 41).  He testified that he stopped working in 2005 when his employer decided to down-size (R. 42).  In a disability report, Plaintiff indicated that he quit working as of January 1, 2006, as a self-employed carpenter after his tools were stolen (R. 189).  At the hearing, he confirmed that he had not worked after 2005 (R. 42), although medical records reflect that in 2008, he was working as a self-employed carpenter and later as a job appraiser (R. 432, 485).

Plaintiff filed his applications for disability benefits on May 26, 2009, alleging an onset of disability as of January 1, 2006 (R. 159-69).  This date of onset of disability was later amended to May 26, 2009 (R. 54).  In response to a questionnaire completed at the same time as his application, Plaintiff alleged that he could not work due to neuropathy in this calves and feet; his third, fourth, and fifth lumbar discs were out of alignment; arthritis in his knees; and numbness in his hands, although his hands were not as bad as his calves and feet (R. 188).  He reported that he could not drive because of numbness in his feet (R. 202).  He could not walk for more than a quarter mile on a good day, and he could not stand for long periods of time (R. 189).  He also reported an unexplained weight loss of 82 pounds[3] (R. 189).  He described his activities of daily living as watching TV, cooking dinner, doing laundry and basic household chores (R. 199).  He was able to handle his own personal care (R. 200), go shopping (R. 203), perform basic repairs and do yard work (R. 202), although these tasks took him longer than before (R. 202).  In addition to the limitations described above, Plaintiff indicated that he could not lift more than 50 pounds, climb ladders, run or play sports (R. 200, 204).  He reported that pain kept him awake at night (R. 200).  As for his medications, he was taking only Advil and Benadryl because he could

_____

[3]  This alleged weight loss is not supported by the medical records.

not afford prescription medications (R. 201).  When the pain was extreme, he used a walker, which was provided by Griffin Hospital, and he also had a cane (R. 205).

On September 22, 2009, Plaintiff was examined by Dr. Yacov Kogan, a consulting physician for Connecticut Disability Determination Services ("DDS").  The history taken by Dr. Kogan indicates that Plaintiff had quit drinking a month prior (R. 574).  Plaintiff reported only one hospitalization for alcohol detoxification in mid-2008 at Griffin Hospital (R. 574).  He reported a two-year history of numbness, parasthesia, burning, and sharp pains involving both feet diffusely and to a lesser degree both hands diffusely (R. 574).  Plaintiff gave a history of having been diagnosed with Hepatitis C approximately one year prior, for which he had not received treatment (R. 574).  He denied abdominal pain, jaundice, or peripheral edema (R. 574).  He also reported a history of chronic low back pain and bilateral knee pain since 1999, when he injured his lumbar spine lifting a heavy object (R. 574).  He stated that he experienced frequent pain involving his lumbar spine and both knees, exacerbated with prolonged sitting, standing, walking, lifting, and bending (R. 574).  Plaintiff denied bladder or bowel dysfunction (R. 574).  On physical examination, Dr. Kogan reported that Plaintiff's weight was 246 pounds (R. 575).  He exhibited no edema, no effusion, no tenderness, no limited range of motion of any joints of the upper and lower extremities (R. 575).  His lumbar spine showed no tenderness and exhibited full range of motion (R. 575).  Both knees also demonstrated no tenderness, no swelling, no redness, no heat, and full range of motion with good strength  (R. 575).  Neurologically, Plaintiff demonstrated 5/5 strength in his upper and lower extremities bilaterally and normal fine finger movements (R. 575).  However, he exhibited decreased pin-prick sensation on both legs from mid-leg to his toes in a diffuse and circumferential distribution (R. 576).  Vibration was absent in

his toes and decreased in his ankles (R. 576).  In his upper extremities, sensation to pin prick and vibration was normal (R. 576).  Dr. Kogan described Plaintiff as ambulating independently with variably short and slow steps but otherwise having a stable, independent gait (R. 576).  Straight-leg raising was to 80 degrees without pain or discomfort (R. 576).

In October 2009, Dr. Carol Honeychurch, a consulting physician for DDS, reviewed the file, including Plaintiff's medical records, and determined that Plaintiff had the residual functional capacity ("RFC") to perform sedentary work, that his non-exertional limitations did not significantly erode the occupational base, and that there was a significant number of jobs existing in the national economy that he could perform (R. 66).  Thus, she determined that he was not disabled (R. 66).

In a second activities of daily living report, dated December 18, 2009, Plaintiff indicated that he had difficulty gripping and holding objects, climbing stairs, and kneeling (R. 219).

The first treatment record post-dating Plaintiff's alleged onset of disability is from Hill Health Center on February 9, 2010 (R. 582).  Plaintiff's height was 6′2″ and his weight was 244 pounds (R. 582).  His past medical history was significant for alcohol abuse (R. 582).  The treating doctor noted that Plaintiff had cancelled many appointments in the past (R. 582).  He presented with complaints of left leg pain and swelling, which he had experienced in the past, as well as foot pain for a long time (R. 582).  Plaintiff denied any trauma or history of gout (R. 582).  He wanted pain medications (R. 582).  He had started drinking again two days prior (R. 582).  There were no other issues reported (R. 582).  On examination, his left leg was swollen and tender to touch (R. 583).  The doctor felt that his leg pain and swelling were most probably related to alcohol neuropathy (R. 583).  Plaintiff was prescribed Gabapentin and was referred to

5

physical therapy and to a psychiatrist (R. 583).  The doctor noted that he discussed with Plaintiff

that nothing would help if he did not stay sober (R. 583).

A disability report dated March 1, 2010, indicates that Plaintiff had reported that the

numbness and pain in his hands and feet had increased, that he was now suffering from

depression because of the pain, and that walking had become more difficult (R. 227).  Plaintiff

related that he was not treating for his depression, because he did not believe in it.  He was not

taking medication nor was he in counseling, and any depressive symptoms he was experiencing

were not interfering with his activities of daily living (R. 232).  Later that month, when Plaintiff

filed an appeal of the initial adverse determination, he reported that, in addition to the problems

listed above, he was falling more and suffering from insomnia (R. 233).

In March 2010, Dr. Khurshid Khan reviewed the record for DDS in connection with

Plaintiff's appeal and agreed with Dr. Honeychurch that Plaintiff could perform sedentary work

and that he was not disabled (R. 78-79).

The only other medical record post-dating Plaintiff's alleged onset of disability is from

the Hill Health Center on February 7, 2011, when Plaintiff presented for a physical and with

complaints of left foot pain (R. 586).  The doctor noted that Plaintiff had not seen a doctor for

two years (R. 586).  Plaintiff's past medical history was listed as alcohol abuse, chronic low back

pain, Hepatitis C, and hypertriglyceridemia[4] (R. 586).  The only medication he was taking was

Motrin as needed (R. 586).  His weight was 253 pounds (R. 586).  Plaintiff complained of left

foot pain, which he had experienced for two years and which had gotten worse over the last three

---

[4]  Hypertriglyceridemia is an excess of triglycerides in the blood.
http://medical-dictionary.thefreedictionary.com/hypertriglyceridemia.

months.  It was worse with walking and standing.  He reported some relief with Motrin, which was also helping his back pain and arthritis.  He also had tingling and numbness in his foot, which was chronic (R. 586).  Plaintiff had been diagnosed with alcohol-induced neuropathy two years ago.  He was prescribed Neurontin but it did not help so he quit taking it (R. 586).  On examination, Plaintiff exhibited some tenderness in the epigastric region (R. 587).  His power was 5/5 throughout, sensation intact, straight-leg raising was negative (R. 587).  The assessment/plan was for Plaintiff to have certain lab tests; he was counseled to quit smoking; Celebrex was prescribed for his left foot pain, back pain and arthritis, and he was referred to a podiatrist; and he was to return in two weeks with his blood work  (R. 587).

At the administrative hearing before ALJ Thomas on March 10, 2011, Plaintiff, who was represented by counsel, testified that he was unable to work because of the neuropathy in his feet and hands (R. 43).  He said the neuropathy went down his calves into his feet and in his wrists through his hands, which made it difficult for him to grasp his tools (R. 43).  At his last medical visit to the Hill Health Center, he had been referred to a podiatrist for his feet (R. 44).  Before that, it had been eight months to a year since he had seen a doctor.  Transportation was an issue, and he claimed to have a fear of doctors that had developed as a result of his multiple hospitalizations in 2008 (R. 45).  At the time of the hearing, he was taking Celebrex, which he had been on for two months and which helped a little with his arthritis; prior to that, he had taken Neurontin, which did not help (R. 45).  Plaintiff testified that he had quit drinking alcohol on or about July 4, 2010 (R. 45, 49).  The last time he had anything to drink he felt "as bad as you could the next day, swelling in my feet," and he decided to quit drinking (R. 49).  Since that time, the condition of his feet and hands had not changed, although his hands had become a little more

7

"touchy as far as letting [him] grip things" (R. 50, 49).  He also has been diagnosed with

Hepatitis C but had not received any treatment (R. 46).  He described the pain in his feet as

constant, and sometimes he had pain in his back and hands (R. 46).  Occasionally, he needed to

use a cane.  He used to use a walker, but did not need to use it much anymore (R. 47).  He

testified that he spent his days watching television, playing online poker, reading a lot, and using

the internet (R. 48-49).  He had let his driver's license expire because he was not able to "judge

the break [sic] or the gas" (R. 49).  He described the difficulties with his hands as locking up

after five to ten minutes when he was using a pen, pencil, scissors, or a paint brush (R. 50).

Occasionally, it was also difficult for him to hold a fork (R. 50).  He described the pain in his

calves as "if your foot fell asleep and never woke up" (R. 51).  He also experienced sharp,

stabbing pain if he stepped on anything unusual (R. 51).  Additionally, the weather could make

his pain worse (R. 52).  His back pain would come and go.  It depended on what he was doing.

For example, if he sat for two hours, he would have to stretch.  His knees would also lock up.  He

said he could feel fine when he went to bed and wake up with pain in his back (R. 51).  In

addition to medication, Plaintiff used heating pads and sometimes ice for pain relief (R. 52).

Plaintiff stated that he did not like to take stronger pain medication because it did not agree with

his stomach (R. 52).

<u>Discussion</u>

Plaintiff raises six primary issues as grounds for reversal and/or remand: (1) the ALJ

committed numerous factual errors, which deprived Plaintiff of a full and fair hearing; (2) the

ALJ failed to find that some of Plaintiff's impairments were "severe" and failed to evaluate all of

his impairments in combination; (3) the ALJ incorrectly determined that Plaintiff did not have a

8

listed impairment; (4) the ALJ did not properly assess Plaintiff's credibility; (5) the ALJ failed to properly determine Plaintiff's RFC; and (6) the ALJ improperly decided Plaintiff's case using the "grids."

## I.  Alleged Factual Errors

Plaintiff sets forth ten allegedly incorrect statements made by the ALJ.  Most of these concern the remaining five issues and will be addressed as necessary in connection with a discussion of those issues.  Two, however, are independent and warrant discussion here. The first is that the ALJ incorrectly stated that Plaintiff's child was adopted.  As Defendant concedes, this statement was incorrect, but it is immaterial to the question of Plaintiff's disability.  The second alleged error is that the ALJ incorrectly concluded that the reason Plaintiff could not drive was due to pain in his feet, when in fact it was because of numbness which prevented Plaintiff from feeling the brake and accelerator.  Although at one point the ALJ did state that Plaintiff could not drive because of pain in his feet, in the preceding paragraph, the ALJ acknowledged Plaintiff's claim that he was disabled by neuropathy and numbness in his calves and feet such that he could not drive (R. 28).  The Court finds no error in the ALJ's subsequent statement that he could not drive because of pain in his feet and, certainly, cannot find that Plaintiff was denied a full and fair hearing because of this minor misstatement.

## II.  Plaintiff's Severe Impairments

Plaintiff next contends that the ALJ erred in not finding that his gastrointestinal ailments, his cardiovascular disease, his chronic obstructive pulmonary disease ("COPD"), and his back and knee pain were severe impairments.  Plaintiff also argues that the ALJ erred in not attributing any functional limitations to his obesity.

Here, the ALJ determined that Plaintiff had the following severe impairments: a substance abuse disorder, in short-term remission; alcoholic neuropathy; and obesity (R. 26). The ALJ found that Plaintiff's back and knee pain was not a severe impairment because he had not sought or received ongoing therapeutic or medicinal treatment for a back or knee impairment (R. 27). The ALJ reasoned that "an impairment cannot be established based only upon the claimant's statements of symptoms" (R. 27). While Plaintiff had made subjective allegations of back pain to his treating sources and had recently been prescribed Celebrex, the ALJ found "no diagnostic evidence in the medical record to establish that the claimant has a back or knee impairment and his physical exams report no diagnostic findings of any limitations caused by a back or knee impairment. The medical records document essentially normal physical examination findings, with no appreciable deficits caused by any back or knee impairment" (R. 27).

At step two in the sequential evaluation process, the ALJ must determine whether the claimant has a severe medically determinable physical or mental impairment that has lasted or is expected to last for a period of at least 12 months. 20 C.F.R. § 416.920(a)(4)(ii). Rather than defining the term "severe impairment," the regulations define a "non-severe impairment." "An impairment or combination of impairments is not severe if it does not significantly limit [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 416.921(a). Basic work activities include physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; capacities for seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a

routine work setting.  20 C.F.R. § 416.921(b).

The determination of whether an impairment is severe has a low threshold.  *Bowen v. Yuckert*, 482 U.S. 137, 149 n. 7 (1987).  "A finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.'"  *Juarbe v. Astrue*, No. 3:10cv1557, 2011 WL 4542964, at *6 (D. Conn. Aug. 30, 2011) (internal citations omitted), *report and recommendation adopted by* 2011 WL 4542962 (D. Conn. Sept. 28, 2011).  It is well-established that this step in the evaluation process should be used to only screen out *de minimis* claims. *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995); *Parker-Grose v. Astrue*, 462 Fed. Appx. 16, 17 (2d Cir. 2012); *Serrano v. Astrue*, 645 F. Supp. 2d 64, 66 (D. Conn. 2009).  .

With respect to Plaintiff's gastrointestinal problems, cardiovascular disease, and COPD, it is significant that, at the administrative hearing, Plaintiff did not mention any of these conditions as reasons why he could not work (R. 43).  Moreover, none of these alleged impairments are mentioned by Plaintiff in any of the disability papers filed with DDS (R. 188, 233).  When Plaintiff was examined by Dr. Kogan, he specifically denied any bladder or bowel dysfunction, and there is no mention of symptoms caused by cardiovascular disease or COPD (R. 575).  Moreover, his respiratory and abdominal examination was normal (R. 576).  Additionally, Plaintiff's treatment records from 2010 and 2011 do not mention any gastrointestinal issues (R. 582-83, 586-87).

While the medical records pre-dating his alleged onset date do contain numerous references to gastrointestinal ailments, these occurred during a period when Plaintiff was still drinking heavily, and many of his diagnosed gastrointestinal impairments were considered to be

alcohol-related and resolved by the end of each hospitalization (R. 328, 549, 250, 547, 463, 485, 538).  *See* 20 C.F.R. § 416.935 (A claimant will not be considered disabled if drug addiction of alcoholism is a contributing factor material to the determination of disability.)  There is nothing in Plaintiff's testimony or the medical records from the period post-dating Plaintiff's alleged onset of disability to suggest that these were ongoing problems or that Plaintiff would need to have a work station next to a bathroom and might be required to take as many as twenty bathroom breaks a day, as Plaintiff now suggests.

As for his cardiovascular disease, COPD, and allergies, there is no evidence that these conditions would have more than a minimal effect on his ability to perform basic work activities. The mere diagnosis of a condition says nothing about the severity of that condition.  *Burrows v. Barnhart*, No. 3:03cv342, 2007 WL 708627, at *6 (D. Conn. Feb. 20, 2007).  The burden is on Plaintiff to provide medical evidence that an alleged impairment limited his ability to work.  20 C.F.R. § 416.912(a); *Britt v. Astrue*, 486 Fed. Appx. 161, 163 (2d Cir. 2012); *Burrows*, 2007 WL 708627, at *6.  This Plaintiff has failed to do with respect to these alleged impairments.

As for his back and knee problems, Plaintiff initially reported that two of the conditions that limited his ability to work were the misalignment of his third, fourth, and fifth lumbar [discs] and arthritis in his knees (R. 188).  He also testified that he experienced constant pain in his feet mostly, but sometimes in his back and sometimes in his hands (R. 46).  His "back pain comes and goes.  It depends on what [he's] doing.  If [he's] sitting for long periods of time, say, two hours, [he] always ha[s] to stretch.  One way or another [he has] to get up because [his] knee will lock" (R. 51).  He testified that he used medication, heating pads, and sometimes ice packs to relieve the pain (R. 52).

When Plaintiff was examined by Dr. Kogan, the doctor observed no tenderness of the lumbar spine and found full range of motion, although he did note Plaintiff's complaints of frequent pain of the lumbar spine and bilateral knees, exacerbated with prolonged sitting, standing, walking, bending, and lifting (R. 576-77).  In February 2011, when Plaintiff went to the Hill Health Center, chronic low back pain was noted under past medical history.  Plaintiff was taking Motrin for his back pain and arthritis, which helped (R. 586).  Dr. Bao's diagnoses included chronic back pain and arthritis, for which he prescribed Celebrex (R. 587).

Additionally, contrary to the ALJ's conclusion that there is no evidence to support Plaintiff's allegations that he suffers from a back or knee impairment that is expected to last for a period of 12 months (R. 27), the medical records show that Plaintiff sought treatment for his back and/or knee pain dating back to 2007 (R. 378, 557, 550, 314).  On October 12, 2007, Plaintiff presented at the Griffin Hospital Emergency Room with complaints of bilateral foot numbness and knee pain of 10/10 for about a month (R. 378, 382).  Tenderness of his knees was noted, and Plaintiff was prescribed Percocet (R. 379).  Plaintiff was then seen at the Hill Health Center by Dr. Mercado for complaints of sharp knee pain and numbness in his feet and hands (R. 557).

During Plaintiff's numerous hospitalizations in 2008, Plaintiff consistently gave a history of having injured his back in the late 1990s while performing heavy lifting (R. 327, 348, 461, 558, 574), and his medical history of chronic low back pain was repeatedly noted (*e.g.* R. 461, 465, 468, 484, 498, 504).  On June 4, 2008, Plaintiff was admitted to Griffin Hospital after presenting at the ER with complaints, *inter alia*, of 7/10 pain in his knees and back when standing (R. 338, 341, 343).  On examination, his back was normal and his extremities exhibited full range of motion, albeit painful (R. 339).  The consulting gastroenterologist's assessment

included chronic low back syndrome with distal paresthesias (R. 354).  When Plaintiff was

examined by Dr. Webb, a neurologist, he reported chronic back pain and indicated that he had

been unable to work as a carpenter due to low back and knee pain (R. 348).  On July 10, 2008,

when Plaintiff went to the Griffin Hospital ER, on examination, his back exhibited tenderness

and "patient states [illegible] for chronic back pain" (R. 314).  He also exhibited tenderness in his

lower extremities bilaterally from his knees to his feet (R. 314).  Plaintiff was prescribed

Percocet and discharged home (R. 314). The following month, when Plaintiff was again admitted

to Griffin Hospital, his complaints included chronic back pain and joint pains (R. 498).  During

this admission, Plaintiff rated his knee pain as 8 out of 10, for which he was again prescribed

Percocet (R. 510).  In November 2008, when Plaintiff was admitted to Griffin Hospital, he

reported that he was taking a significant amount of NSAIDS (non-steroidal anti-inflammatory

drugs) for his back pain (R. 432).  Given Plaintiff's testimony, the diagnoses of chronic back and

knee pain, for which Plaintiff was prescribed pain medication, and the doctors' reported

observations of pain upon palpation, the Court finds that the ALJ's conclusion that Plaintiff's

back and knee pain was not a severe impairment is not supported by substantial evidence in the

record.[5]  *See Juarbe*, 2011 WL 4542964, at *6 (finding that the plaintiff's well-documented

_____

[5]  The regulations provide that a claimant's symptoms, such as pain, fatigue, shortness of
breath, weakness, or nervousness, will not be found to affect his or her ability to do basic work
activities unless medical signs or laboratory findings show that a medically determinable
impairment is present.  20 C.F.R. § 416.929(b).  The regulations further define "signs" as
"anatomical, physiological, or psychological abnormalities which can be observed, apart from
[the claimant's] statements.  Signs must be shown by medically acceptable clinical diagnostic
techniques."  20 C.F.R. § 416.928(b).  Laboratory findings, however, are defined as "anatomical,
physiological, or psychological phenomena which can be shown by the use of a medically
acceptable laboratory diagnostic techniques."  20 C.F.R. § 416.928(c).  Examples include
electrophysiological studies and x-rays.  *Id.*  In this case, while there were no "laboratory
findings" documenting Plaintiff's neck and back pain, there were "signs," such as the doctor's

history of back and abdominal pain should have been considered a "severe" impairment).

Defendant argues that, because ALJ did not screen out Plaintiff's claim entirely, the ALJ's failure to consider Plaintiff's back and knee impairments as "severe" impairments was at worst harmless error because he was under an obligation to consider all of Plaintiff's impairments in combination during the remaining steps of the sequential evaluation process. Had the ALJ considered Plaintiff's knee and back impairments in combination with his other severe impairments throughout the sequential evaluation process, Defendant's argument would have merit. For example, in *McKiver v. Barnhart*, No. 3:04cv1080, 2005 WL 2297383, at *11 (D. Conn. Sept. 16, 2005), this Court found the ALJ's failure to find that the claimant's mental impairment was "severe" was harmless error because he continued the sequential evaluation process and it was clear that he did not ignore her mental impairments in the addressing subsequent issues in the sequential evaluation process. *Id.*, 2005 WL 2297383, at *12. Here, however, Defendant's argument is unavailing. Once the ALJ determined that Plaintiff's back and knee pain was not a severe impairment, there is no indication that he ever considered it again in combination with Plaintiff's other impairments in assessing his RFC. *See Parker-Grose*, 462 Fed. Appx. at 18 (holding that it was not harmless error for the ALJ to have found a mental impairment non-severe, where the ALJ did not take into account the restrictions caused by the mental impairment in assessing the claimant's RFC); *Burgos v. Astrue*, No. 3:09cv1216, 2010 WL 3829108, at *3 (D. Conn. Sept. 22, 2010) (reversing and remanding a case where the ALJ failed to mention certain of the claimant's ailments and the Court could not ascertain whether these were considered in combination with his other severe impairments); *Wright v. Barnhart*,

---

observation of tenderness of the back on palpation (*e.g.*, R. 314).

No. 3:05cv1487, 2006 WL 4049579, at *15 (D. Conn. Dec. 14, 2006) (finding that it was not harmless error for the ALJ not to consider a mental impairment as a severe impairment, where he set it aside and proceeded to evaluate the claimant's disability based solely on her physical impairments).  Thus, the Court rejects Defendant's argument that this was harmless error.

As for his obesity, Plaintiff maintains that, although the ALJ found it to be a severe impairment, he failed to ascribe any functional limitations to his obesity.  Without any citation to evidence in the record, Plaintiff maintains that his obesity would have limited his ability to stand and walk, to stoop, bend, lift, twist, squat, kneel, crawl, crouch, climb, balance, and operate foot pedals and controls (Pl.'s Mem. at 24).  Although Plaintiff was repeatedly diagnosed with obesity, there is absolutely no evidence of any functional limitations caused by Plaintiff's obesity.  The Court finds no error in the ALJ's failure to attribute any additional functional limitations to his obesity.

Lastly, Plaintiff argues that the ALJ erred in not considering all of Plaintiff's impairments singly and in combination.  The Court agrees.  As discussed above, the ALJ did not consider Plaintiff's back and knee pain after he rejected them as a severe impairment.  *See* 20 C.F.R. § 416.923 (requiring the ALJ to consider the combined effect of all of a claimant's impairments throughout the disability evaluation process); Social Security Ruling 85-28, 1985 WL 56856, at *3 (S.SA. 1985).  Upon remand, the ALJ should be instructed to re-evaluate this impairment and to consider all of Plaintiff's impairments, both severe and non-severe, in his disability determination.  *Dixon*, 54 F.3d at 1031.

III.  The Listings

Plaintiff next argues that the ALJ erred in failing to determine that his peripheral

neuropathy met Listing 11.14, which is incorporated by reference into Listing 12.09E, relating to peripheral neuropathies associated with alcohol abuse.  20 C.F.R. Part 404, Subpart P, Appendix 1.  The ALJ determined that Plaintiff's neuropathy did not meet the requirements of Listing 12.09E because the evidence did not establish the requisite disorganization of motor function (R. 27).  The Court finds substantial evidence to support the ALJ's finding.

It is well-established that a claimant bears the burden of proving that his impairment meets the requirements of a listed impairment. *Dudley v. Sec'y of Health & Human Servs.*, 816 F.2d 792, 793 (1st Cir. 1987).  As Plaintiff correctly points out, if his impairments meets or medically equals one of the listings, he is automatically presumed to be disabled and entitled to disability benefits, regardless of his ability to work.  20 C.F.R. § 416.920(d), 416.925(a); *Bowen*, 482 U.S. at 141.  The fact that he has an impairment for which there is a listing, however, does not establish that his impairment meets the listing.  Moreover, an impairment cannot meet the criteria of a listing based solely on a diagnosis.  20 C.F.R. § 416.925(d).  Rather, a claimant must provide medical proof that his impairment satisfies all of the medical criteria of the listing.  *See* Carolyn A. Kubitschek, *Social Security Disability Law and Procedure in Federal Court* § 3:20 (2008 ed.); *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *Crossman v. Astrue*, 783 F. Supp. 2d 300, 304  (D. Conn. 2010).  "An impairment that manifests only some of those criteria, no matter how severe, does not qualify."  *Sullivan v. Zebley*, 493 U.S. at 530 (citing SSR 83-19).

To meet the requirements for an alcohol-related neuropathy under Listing 12.09E, a claimant must be evaluated under Listing 11.14, which pertains to peripheral neuropathies, and requires the claimant to have "disorganization of motor function as described in 11.04B, in spite of prescribed treatment."  20 C.F.R. Part 404, Subpart P, Appendix 1, 11.14.  In turn, Listing

11.04B requires "significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00C)."  *Id.* at 11.04B.  Section 11.00C then explains that

> persistent disorganization of motor function in the form of paresis or paralysis, tremor or other involuntary movements, ataxia and sensory disturbances . . . which occur singly or in various combination, frequently provides the sole or partial basis for decision in cases of neurological impairment.  The assessment of impairment depends on the degree of interference with locomotion and/or interference with the use of fingers, hands, and arms.

*Id.* at 11.00C.

In support of his argument that his peripheral neuropathy meets the requirements of Listing 11.14, Plaintiff cites to the medical evidence that he had difficulties with balance and ambulation.  The medical evidence, however, does not support the degree of severity of motor disorganization required for Listing 11.14.  The EMG performed in June 2008, when Plaintiff was diagnosed with peripheral neuropathy, revealed "mild neuropathic changes on EMG, although motor conduction studies remain essentially within normal limits" (R. 377).  Dr. Webb, a neurologist, noted only slight weakness of the extensor hallucis longus muscles in his feet and mild ataxia of the lower extremities on heel-to-shin testing.  Otherwise, his muscle bulk, strength, and tone were normal (R. 349).  Plaintiff was observed to have an unsteady gait by Dr. Webb and the attending doctor, but this was attributed to his weakness and dizziness (R. 339).  Moreover, this was before treatment.  *See* Listing 11.14 (requiring disorganization of motor function as described in 11.04B, *in spite of prescribed treatment*).  When Dr. Kogan examined Plaintiff in 2009, he reported 5/5 strength of the upper and lower extremities bilaterally and fine finger movements were fine (R. 575).  Accordingly, the Court finds substantial evidence in the

record to support the ALJ's determination that Plaintiff's peripheral neuropathy did not meet the

requirements of Listing 11.14, and consequently Listing 12.09E, because the evidence does not

establish the requisite level of motor disorganization.  *See Crews v. Astrue*, No. 10 Civ. 5160,

2012 WL 1107685, at *17 (S.D.N.Y. Mar. 27, 2012) (finding that claimant did not meet the

requirement of persistent disorganization of motor function where doctors found full or nearly

full strength in his extremities), *report and recommendation adopted by* 2012 WL 2122344

(S.D.N.Y. June 12, 2012).

IV.  Plaintiff's Credibility

Plaintiff's next assignment of error is that the ALJ failed to adequately set forth the

reasons supporting his credibility assessment and failed to properly evaluate his allegations of

pain.  The regulations provide a two-step process for evaluating a claimant's assertions of pain

and other limitations.  20 C.F.R. § 416.929; *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).  At

the first step, the ALJ must decide whether the claimant suffers from a medically determinable

impairment that could reasonably be expected to produce the symptoms alleged.  20 C.F.R. §

416.929.  Second, the ALJ must consider the extent to which the claimant's symptoms can

reasonably be accepted as consistent with the objective medical evidence and other evidence of

record.  20 C.F.R. § 416.929; *see also* Social Security Ruling 96-7p, 1996 WL 374186, at *2

(S.S.A. July 2, 1996).

The Court has already determined that this matter should be remanded because of the

ALJ's erroneous determination at step two that Plaintiff's back and knee pain was not a "severe"

impairment.  Upon remand, the ALJ should also reassess Plaintiff's credibility in light of his

documented back and knee pain.

V.  The ALJ's RFC Assessment

Next, Plaintiff challenges the ALJ's RFC determination, because he failed to make specific findings as to the amount of stress Plaintiff could tolerate, as to the location, intensity, persistence and limiting effects of his pains, and as to his episodic symptoms of diarrhea, nausea, and vomiting; he failed to include or explain his reasons for not including all of the limitations imposed by the DDS doctors; and he failed to consider the limiting effects of all of Plaintiff's impairments in combination.  Again, because the Court has already determined that this matter must be remanded, a new RFC assessment will be required.

VI.  The Grids

Last, Plaintiff challenges the ALJ's use of the medical-vocational guidelines, commonly referred to as "the grids," 20 C.F.R. Part 404, Subpart P, Appendix 2, in determining whether a significant number of jobs existed in the national economy that Plaintiff could perform.  Only if a claimant's non-exertional impairments significantly limit the range of work permitted by his exertional limitations will the grids not accurately determine disability status.  *Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986).  If a claimant has non-exertional limitations that significantly limit the range of work permitted by his exertional limitations, the ALJ is required to consult with a vocational expert.  *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010).  A non-exertional limitation significantly limits a range of work when it causes an "additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity."  *Id.*  Here, the ALJ determined that Plaintiff's non-exertional impairments did not significantly limit Plaintiff's ability to perform sedentary work, and, therefore, it was appropriate to rely on the grids (R. 31).  However,

as discussed above, the ALJ did not consider Plaintiff's knee and back pain in making this

determination.  Whether the grids will apply is an issue that will have to be revisited on remand.

<u>Conclusion</u>

Accordingly, for the reasons discussed above, the Court recommends that Plaintiff's

Motion for Order Reversing the Decision of the Commissioner or In the Alternative Motion for

Remand for Rehearing [Doc. # 16] be GRANTED.  The Court further recommends that

Defendant's Motion for Order Affirming the Decision of the Commissioner [Doc. # 19] be

DENIED.

This is a Recommended Ruling.  *See* Fed. R. Civ. P. 72(b)(1).  Any objection to this

Recommended Ruling must be filed within 14 days after service.  *See* Fed. R. Civ. P. 72(b)(2).

In accordance with the Standing Order of Referral for Appeals of Social Security

Administration Decisions dated September 30, 2011, the Clerk is directed to transfer this case to

a District Judge for review of the Recommended Ruling and any objections thereto, and

acceptance, rejection, or modification of the Recommended Ruling in whole or in part.  *See* Fed.

R. Civ. P. 72(b)(3) and D. Conn. Local  Rule 72.1(C)(1) for Magistrate Judges.

SO ORDERED, this ___29th___ day of April, 2013, at Bridgeport, Connecticut.

___/s/ *William I. Garfinkel*_____
WILLIAM I. GARFINKEL
United States Magistrate Judge